Edwin S. MONNIG, et al., Defendants-Respondents,

v.

Mildred F. LEWIS, Plaintiff-Appellant.

No. WD 31419.

Missouri Court of Appeals, Western District.

May 4, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1981.

Michael L. Midyett, Keytesville, for appellant.

Jack Lukehart, Brunswick, for respondents.

Before TURNAGE, P.J., and MANFORD and KENNEDY, JJ.

MANFORD, Judge.

This is an action to quiet title tried to the court. Judgment was entered to defendants' favor. The judgment is reversed with directions.

Review of this case is pursuant to *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976) and Rule 73.01, upon both the facts and the law. See also *Howard v. Nicholson*, 556 S.W.2d 477 (Mo.App. 1977). The parties are referred to by their party designation at trial.

Appellant (plaintiff) filed her petition in four counts. Count I was an action to quiet title against *all* defendants. Count II was an action in ejectment, preliminary injunction and damages against respondent (defendant) Monnig. Count III was an action in ejectment, preliminary injunction and damages against respondents (defendants) Victor Starke and Josephine Starke. Count IV was an action in ejectment, preliminary injunction and damages against respondents (defendants) James Starke and Joyce Starke.

Since this review is of the entire record upon both the law and facts, the evidence must be set forth in detail. The disputed issue is: Who owns (and by what right or claim of right) a certain parcel of land consisting of some 45 acres (more or less), situated in Chariton County? This parcel emerged as usable land, the result of both natural and human changes applied to the channel and course of the Missouri River. Nature provided some change, and the Corps of Engineers provided the rest, through a series of dikes, levees and other channel work. The human intent was to improve the navigability of the river. The location of this alteration (the disputed area) is near the city of Glasgow (Howard County), the Chariton River and the abandoned town of Louisville, Missouri. The combined natural and human influence upon the river channel produced a slow, but successive, channel change, which in turn caused land (the disputed 45 acres) to accrete to the acreage which had marked the previous eastern bank of the Missouri River. The eastern bank had been the location of the Wabash Railroad Co. right of way, which transversed the disputed area.

At this juncture, it is necessary to detail how the parties assert their respective claims of title. The plaintiff claims title

through inheritance. Plaintiff's brother-in-law, Everett Lewis, owned the land bordering the river and hence was a riparian owner. On December 14, 1942, the Wabash Railroad Co., by indenture, transferred its right of way to Everett Lewis. This indenture was properly recorded with the Chariton County Recorder. Everett Lewis died on April 26, 1964. Mr. Lewis willed the property to his brother, Richard Lewis and to plaintiff Mildred Lewis, Richard's wife. The probate court records concerning the Everett Lewis estate are a part of the record in this case. Richard Lewis, husband of the plaintiff, died on January 17, 1969. Plaintiff claims the land as the surviving joint owner.

The Monnigs claim ownership of a portion of the land through various deeds originating from a deed executed by the Chariton County Court under date of December 30, 1963. The county court deed was to William and Sarah Neville as grantees. William Neville died and his surviving spouse, Sarah, by deed, transferred the property to Lawrence and Wanda Neville on January 24, 1972. On April 4, 1972, Lawrence and Wanda Neville transferred the property to the Monnigs. In addition to their claim by deed, the Monnigs claim title by adverse possession.

The Starkes claim ownership to a portion of the land through a deed from William and Sarah Neville. These defendants also claim title by adverse possession.

Although the record herein is replete with an abundance of both oral and documentary evidence relating to the conflicting claims, the question on this appeal is whether or not the evidence supports defendants' claim by adverse possession.

The evidence is sufficient to show that plaintiff was owner of the land by inheritance from her deceased brother-in-law. The brother-in-law was possessed of the property by deed and his ownership was

enhanced in 1942 by the indenture from the Wabash Railroad Company. When the railroad transferred its holding (its old road bed) to Everett Lewis, Mr. Lewis became a riparian landowner whose property was bordered on the west by the Missouri River. The evidence sufficiently supports the validity of plaintiff's claim by inheritance.

Although all defendants claim ownership to respective portions of the land by deed, neither the evidence herein nor the law supports such claim. The evidence shows that William and Sarah Neville supposedly acquired title by deed from the Chariton County Court. This deed was executed by the county court on December 30, 1963. It recited the formation of the land as a result of recession of the Missouri River. In addition, the deed stated that the land was granted to the county by the Land Accretion Act.

The Chariton County Court incorrectly interpreted and applied the land Accretion Act. This act (now § 241.290, RSMo 1978 [1]) does not vest or grant ownership of accreted lands to any county.

■ The property in dispute is accreted land, not land commonly referred to as abandoned river or lake bed, or land, which as a result of the change of river course, became island land. Land which is added to the land of a riparian owner by accretion becomes the land of the riparian owner, not the county or State of Missouri. *Drumm v. Cole County*, 315 Mo. 568, 287 S.W. 445 (1926). In the instant case, Chariton County was never granted or vested with title or patent to the land. The attempted transfer of this land to William and Sarah Neville by the county was without any authority under law and was a nullity as a matter of law. The Nevilles, as alleged grantees under such deed, acquired no right, title or interest in the land. It follows that the Nevilles, being possessed of no right, title or interest, could convey no right, title or in-

1. § 241.290 reads: "All lands belonging to the state, not otherwise appropriated under the laws thereof, which have been formed by the recession and abandonment of their waters of the old beds of lakes and rivers in this state, or by the formation of islands in the navigable waters of the state, are hereby granted and transferred to the respective counties in which such lands are located, to be held by such counties for school purposes."

terest to their successors. Irrespective of all of the intervening transfers and the consideration expressed in support of such transfers, none of the defendants acquired any right, title or interest to the land by deed.

If defendants' claims rested only upon their claim of title by deed, their claims would fail as a matter of law. Plaintiff has, by the evidence, shown herself possessed of the land by inheritance and is lawful owner by deed. Thus, if the dispute only involved conflicting claims by deed, plaintiff would, as a matter of law, be the lawful owner of the land. Defendants, however, claim title to the property by adverse possession. An analysis of the evidence, coupled with consideration of the principles of adverse possession, becomes necessary to resolve this issue. Upon trial, defendants bore the burden of proving their claims for adverse possession. Review of same is made pursuant to Rule 73.01 upon the facts, the law and *Murphy v. Carron, supra.*

In addition to her documentary evidence of title by deed, plaintiff supported her claim with evidence of a survey showing the area depicted in her deed, the indenture from the Wabash R.R. Co., and the probate records of the Chariton County Probate Court. In addition, she testified that she remembered when the Missouri River was right against the Wabash R.R. Co. road bed. She said that the river has made a gradual change in course since 1942. She added that the railroad abandoned the road bed in 1941, and could recall the removal of a trestle.

Her brother-in-law, Everett Lewis, filled in the bottom area in 1951. In 1953 he added additional fill, which consisted of a load of "corn cobs". She said that her brother-in-law, she and her husband continued to use the land, that they cut tobacco sticks from the land and that Everett and a man named Pack cut posts from it.

On one occasion, when Everett was temporarily ill, she said a man named Tom Campbell built a shack on the property. However, when confronted, the people occu-

pying the shack vacated it. Mrs. Lewis added that in 1961, the Nevilles attempted to purchase the land from plaintiff's brother-in-law, but that he refused to sell.

After Everett Lewis's death, Mrs. Lewis and her husband (in 1964) asked the local road district to come to the property and fill in the washed-out areas. In 1965, they (Mr. and Mrs. Lewis) had junk removed from their property. Also, in this same year, Mrs. Lewis confronted some persons (named Colbert) who were living in the shack. She informed them that the land was hers and asked them to move. They told her that they would move, and this occupancy lasted less than a year.

Plaintiff's evidence shows that no timber was cut from the land between 1942–64. During this same period, plaintiff, her husband and the brother-in-law visited the property frequently, and the brother-in-law raised crops thereon.

In 1968, the Nevilles placed a trailer on the land, but it was there only two days. In 1969, plaintiff's husband died, and after a "gang" attempted to occupy the shack, the shack was condemned at the request of the city of Glasgow, Missouri. The city requested the condemnation from plaintiff. Also in 1969, the city of Glasgow approached plaintiff about purchasing the land from her for use as a city dump. Plaintiff, not desiring the land to be used as a dump, priced the land so high that the city did not proceed with its plans.

Plaintiff testified that she has paid taxes on the land. This fact was disputed, and while the evidence did not show that she paid taxes on the land, it does show that she paid taxes according to her property assessment. In 1965, she requested the assessor to place the disputed area on the tax rolls, the assessor's office discussed this with her, but apparently nothing was ever officially done.

Plaintiff testified that she first became aware of someone clearing the land in 1971. She recognized a notice placed by Larry Neville in a local newspaper. She proceeded to the recorder's office and observed

defendants' claims by deed in the form of quit claim deeds. She then confronted defendant Edward Monnig, who advised her that he had purchased his portion of the land from Larry Neville. She advised Mr. Monnig that the land was hers and further suggested that Mr. Monnig get his money back from Mr. Neville. Mr. Monnig told her that he could not get his money back.

In either 1971 or 1972, plaintiff went to the property and discovered a gate blocking the access to the property. She confronted Larry Starke, because she had heard that he helped construct the gate. Mr. Starke admitted that he helped build the gate, but advised her that it belonged to Mr. Monnig. She then confronted Victor Starke about his quit claim deed and stated that she wanted the gate removed. Victor Starke offered a key to the gate. Plaintiff refused the key and demanded removal of the gate. During 1975–76, timber was removed from the land, and a series of confrontations took place between plaintiff and defendant Monnig over who owned the land. This action commenced on March 9, 1977.

Contrasted with plaintiff's evidence, defendants called seven witnesses. In addition to the evidence of their claim by deed, defendants offered evidence of their claim by adverse possession. The issue of defendants' claim by deed has been answered above, and further reference to defendants' evidence on their claim by deed is not necessary.

Defendants' first witness was the surveyor originally called by plaintiff. This witness provided no evidence relative to the claim by adverse possession. Their second witness was a local resident, who testified that he knew that plaintiff's brother-in-law owned the land, including the railroad bed. He testified that he never knew the brother-in-law to farm the property. He said that Tom Campbell lived in the shack for about one year, and that other parties (Elliott and Kimberling) occupied the shack. He advised that he did not know the Nevilles to ever claim ownership of land, and knew plaintiff claimed the land, but had no knowledge of anyone else claiming owner-ship. In addition, this witness "guessed" that the Nevilles farmed the land, but he had no knowledge if that farming was continuous.

Defendants' next witness, another local resident, testified that she knew that plaintiff claimed ownership. She also testified that she did not know if the Nevilles ever owned the land, but claimed that the land was owned by the Monnigs. She never observed plaintiff either farm or cut timber from the land. She said that her brother-in-law (a Mr. Knoch) built the shack referred to in the evidence and that a Tom Campbell lived in it some 7–8 years prior to the trial. This witness had a garden on the land and admitted that she was confronted by plaintiff about the garden.

The next witness was Edwin Monnig. He testified that he purchased the land in 1972 from Larry Neville and continued to pay taxes on it. It was his testimony that his predecessor (Neville) acquired the property in 1963–64. He testified that he never knew of plaintiff's brother-in-law farming the land or claiming ownership. He said that he did see plaintiff on the land prior to 1972. The local assessor also appeared as a witness and testified that there was no record of assessment on the property under plaintiff's name. However, he said that he had a conversation with her relative to changing the assessment to include the disputed land. Victor Sparke appeared as the next witness, who testified that he bought the land from the Nevilles in 1970 and had paid taxes on it. He testified that he had worked his claimed portion, built fences and ran cattle on it. When asked who owned the land prior to Neville, he advised that he did not think anyone had owned it. He further testified that he thought he currently owned it because of the purchase from Neville.

The last two witnesses were James Starke and William Monnig. Mr. Starke testified that he purchased his claimed portion on December 5, 1974. He assumed that the Nevilles purchased the land in 1963, but was not sure of this fact. He testified that there was intermittent clearing and farm-

ing done by himself, Monnig and Neville since 1963. He stated that he had a confrontation with the plaintiff two years (1975) prior to suit, wherein plaintiff claimed the land. William Monnig was the final witness. He testified that Tom Campbell lived in the shack in 1956. He further testified that the Nevilles purchased the land from Tom Campbell. Without specifying a time period, he testified that the Nevilles held themselves out as the owners of the property.

At the close of the evidence, plaintiff renewed her request for specific findings of fact and conclusions of law. The trial court took the matter under advisement. Some six months later, the trial court entered a judgment for defendants. The judgment was to defendants' favor upon Count I of plaintiff's petition because at the close of plaintiff's evidence, the court had dismissed all subsequent counts within plaintiff's petition.

The judgment of the trial court does not reflect specific findings of fact and conclusions of law, although requested. The judgment entry includes only what could be considered a general declaration of findings and conclusions.

■ However, under Rule 73.01, this court is authorized to review bench tried cases upon both the facts and the law. In those instances where the applicable law and the facts upon the record so permit, this court can enter the judgment that the trial court should have entered. See *City-Wide Asphalt Co., Inc. v. City of Independence*, 546 S.W.2d 493 (Mo.App.1976) and Rule 84.14. Since the record is sufficient in this case to permit a final disposition, a retrial of this cause is unnecessary.

■ As has been pointed out, the evidence was sufficient to establish title to the property in the plaintiff by inheritance and deed. In contrast, the claim of the defendants to title by deed fails as a matter of law. *Drumm v. Cole County, supra,* and § 241.290.

■ As to their claim of title by adverse possession, defendants bore the burden of proof. *Wilton Boat Club v. Hazell,* 502 S.W.2d 273 (Mo.1973). In order that title by adverse possession be established, the evidence must show that the party claiming such title and their predecessors have been in open, actual, notorious, hostile, exclusive and continuous possession of the land for a period of at least ten years. Every element of such adverse possession claim must be shown to exist in order to acquire title. *Horton v. Gentry,* 357 Mo. 694, 210 S.W.2d 72 (1948). No title by adverse possession can ripen in the absence of one or more of these elements. *Brown v. Chapman,* 163 S.W.2d 920 (Mo.1942).

Under the evidence, none of the defendants could claim title by adverse possession as a result of any act of their own, exclusive of any act of their predecessors. The defendants, by their own evidence, did not acquire the property until the period 1970 through 1974. This action, having been filed in 1977, interrupted any direct act by the defendants. Defendants are left to claim title by adverse possession by their own conduct and by "tacking" the acts and time of their predecessors thereto. Only in this manner can the ten-year requisite period be thought of as satisfied.

The evidence herein fails to reveal that defendants' predecessors either independently or collectively claimed possession of the property for a sufficient time, either separately or "tacked" onto defendants' time period so that the ten-year period is satisfied. The evidence shows that various persons entered upon the land at various times for various reasons. The evidence shows that the Colberts, Kimberlings, Campbells and Knochs occupied the shack. There is no evidence to show that these persons occupied the shack in a continuous manner. At best, the evidence shows that the Colberts and Campbells may have occupied the shack one year each. In addition, it cannot be proven that Knoch, Colbert and Kimberling ever held themselves out as owners of the land. The Nevilles may have farmed the land, but no time is framed by the evidence. In contrast, Campbell vacated the shack when confronted by plaintiff's

brother-in-law. Additionally, the Nevilles placed a trailer on the land, and after being confronted by plaintiff's brother-in-law, the trailer was immediately removed. Although the Colberts had a garden on the property, as did one of the defendants' witnesses, in each instance the evidence shows that plaintiff confronted these gardeners with the assertion that she owned the land. In such, there is at best (prior to defendants' claims of 1970–74) an intermittent or sporadic occupancy of a shack on the premises or use of the land. This intermittent or sporadic occupancy or use was not defined under the evidence so that determination of the total time can be ascertained. In addition, plaintiff's predecessor and plaintiff, at various times, interceded, and for various reasons, the occupants or users either left or discontinued the use of the land. There is no evidence to indicate that any of this use or occupancy was continuous after plaintiff's predecessor or plaintiff confronted the occupants or users. Two of defendants' witnesses testified that they did not know whether or not the Nevilles owned the property. One of these witnesses "assumed" that Neville was farming it. The evidence reveals that while the land (prior to 1970–74) was intermittently and sporadically occupied (by use of the shack) or used, it gives no support to a finding that any of this intermittent or sporadic occupancy or use simultaneously included all of the acts necessary to constitute adverse possession.

The judgment entered is against the weight of the evidence since the evidence does not support a finding of title in defendants by adverse possession. *Murphy v. Carron, supra.* In contrast, the evidence is sufficient to support a finding of title in plaintiff by inheritance.

Under Rule 84.14, an appellate court is authorized to give such judgment as ought to have been given. All parties herein submitted evidence to warrant disposition of the matter without a retrial thereof, and it would serve no purpose to rehear said cause. Under the evidence, the trial court should have found the title to the land in plaintiff by inheritance and that plaintiff was entitled to quiet title thereto. In addi-

tion, the trial court, under the evidence, should have found that all defendants have dispossessed plaintiff from the land, but that such dispossession did not sufficiently lodge title in defendants by adverse possession; and as a result thereof, plaintiff was entitled to eject all defendants from the land. The evidence fails to support plaintiff's claim for money damages and the trial court was correct in denying plaintiff's relief therefor.

The judgment for the reasons set forth herein is reversed and the cause is remanded to the circuit court with directions for the entry of judgment finding the title to said property in the plaintiff, and plaintiff is entitled to the peaceful use and enjoyment thereof, free from any and all encumbrances, interference or hindrance by all the defendants herein.

All concur.