Thomas J. PHIPPS, Appellant,

v.

The SCHOOL DISTRICT OF KANSAS CITY, Missouri, Respondent.

No. WD 33243.

Missouri Court of Appeals,
Western District.

Nov. 23, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 4, 1983.

Application to Transfer Denied
Feb. 23, 1983.

Doyle R. Pryor, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, for appellant.

Mildred L. Watson, North, Watson & Bryant, Kansas City, for respondent.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The plaintiff Phipps sought judicial review under § 536.150, RSMo 1978 and Rule 100.08 of the administrative decision by the School District of Kansas City to terminate employment. The circuit court sustained the agency decision, and the plaintiff Phipps appeals.

The plaintiff was one among some one-hundred-forty nonteacher [custodial, maintenance and cafeteria] personnel terminated for absence from work practiced in support of a teacher strike which began March 20, 1977. The plaintiff, a school employee for twenty-four years, held the position of custodian-fireman when the strike began. The Board of Directors of the School District voted the terminations to have effect on April 25, 1977.

Then, on May 6, 1977, a circuit judge ordered the School District to permit all employees terminated during the strike to return to work and on May 9, 1977, the strike ended and the plaintiff resumed employment. A letter of the School District thereafter informed plaintiff Phipps that "evaluation of your performance" prompted demotion from custodian-fireman to custodian I, a lesser classification with lesser pay, effective on June 20, 1977. [Phipps protested that action, but the grievance was never resolved.] On June 27, 1977, our rule in prohibition stayed the order of the circuit court as beyond the judicial power. *School District of Kansas City v. Clymer,* 554 S.W.2d 483 (Mo.App.1977).

In consequence of our adjudication to enjoin the order of the circuit court to reinstate the nonteacher strikers, the School Board by a consensus but without formal vote, decided again to terminate those employees. The letter of the Assistant Superintendent of Schools informed Phipps and the others that "your employment . . . terminated last April 25, 1977 . . . is again made effective at the close of business on July 8, 1977." In response to the School Board action, Walker [secretary-treasurer of the Service Employees' Union, Local 12, representative of the custodial, maintenance and cafeteria school workers]

brought claim in the federal district court that the terminations violated the civil rights of the employees. The suit prompted the School District to enlist the mediation of a labor union official, and in due course a *tentative agreement* was fashioned between counsel. That agreement was formally approved by the School Board and ratified by member of the union local. The terms directed the dismissal of the federal court suit and provided also:

1. *All employees terminated effective April 25, 1977 and/or July 8, 1977* will be permitted to apply for reappointment to the positions from which they were terminated.

2. *[E]ach person who applies for reappointment* by delivering to the District a completed form requesting reappointment *shall be reappointed to a position with the same salary as that position held with the District on the date of termination . . .* Each person who desires reappointment must return the attached form to the District . . . .

\*    \*    \*    \*    \*    \*

4. . . . The District reserves the right to refuse reappointment to those persons whose acts exceeded peaceful support for or participation in the teachers strike.

5. The District reserves the right to discipline each person reappointed pursuant to this agreement by placing in each person's personnel file a written reprimand for that person's conduct during the period March 20, 1977 through July 8, 1977. *The District will take no punitive action, other than said reprimands, against employees whose conduct did not exceed peaceful support for or participation in the teachers strike . . . .* [emphasis added]

The plaintiff Phipps submitted application for reappointment under the terms of the Tentative Agreement [by now a consummated accord]. Instead of reappointment as custodian-fireman [the position and

grade occupied on April 25, 1977 termination] the District offered appointment as a custodian I [as degraded after rehire under the court order later nullified by the appeals court and the position occupied on the July 8, 1977 retermination]. Phipps deemed the offer in violation of the Tentative Agreement and refused employment on those terms. A grievance for Phipps and others proceeded under the method defined in the Tentative Agreement and was denied by a final decision of the School Board. Phipps petitioned for judicial review of the administrative decision, but was dismissed by the circuit court for failure to state a claim. On appeal, we determined that the grievance was entitled to judicial review as an uncontested case under § 536.150, RSMo 1978 and Rule 100.08 and remanded for that exercise [*Phipps v. School District of Kansas City,* 588 S.W.2d 128 (Mo.App.1979)].

The plaintiff Phipps contends on the judicial review remand that the School District offer to appointment as custodian I violates the Tentative Agreement provision to reappoint an applicant "to a position with the same salary as that position held with the District on the date of termination." That contention rests on the rationale that he was terminated only *once*—on April 25, 1977—and that since on that date he was a fireman-custodian, the contract contemplated reappointment to that position and salary. That contention rests also on the cognate premise that the purpose of agreement was to restore the *status quo ante* strike, and that the refusal to reappoint Phipps to custodian-fireman violates that intention. The School Board contends that Phipps was terminated *twice*—once on April 25, 1977 and again on July 8, 1977, and that the offer to appoint Phipps as custodian I [the position he held on that latter date] accords with the Tentative Agreement to restore the applicant employment "to the position from which [he was] terminated." The circuit court on remand adjudged that Phipps was terminated twice, once on April 25, 1977, and then again on July 8, 1977, so that the offer by the School Board to appoint the employee to custodian I—the position he then occupied—conformed to the contract duty to reinstate to the *position held with the District on the date of termination.*

The circuit court understood the function of judicial review under § 536.150 and Rule 100.08 was to adjudge "whether or not there [was] competent and substantial evidence to support the [School Board administrative] decision to reappoint or offer to reappoint plaintiff to the position of custodian I, the position he held July 8, 1977, and to deny his grievance therefrom." That is to say [in terms of the issue as posed by the litigants], that the termination date—as applied to Phipps—meant by the Tentative Agreement was July 8, 1977, rather than April 25, 1977. The memorandum of judgment notes [as does our opinion on the first appeal, *Phipps v. School District of Kansas City,* 588 S.W.2d 128, 133 (Mo. App.1979)] that the administrative hearing was a noncontested case and conducted as such—without a record of the evidence, and hence without a transcript for review. The role of the circuit court on review of an administrative decision on a noncontested case is inherently more encompassed than that on a review of a contested case. *State ex rel. Walmar Investment Co. v. Mueller,* 512 S.W.2d 180, 182[1] (Mo.App.1974). In a contested case, the circuit court reviews a record already composed by the administrative decision and so due the deference of a credibility already assessed and an expertise already applied. *Hermel, Inc. v. State Tax Commission,* 564 S.W.2d 888, 894[1–4] (Mo. banc 1978); *Hill v. Missouri Department of Public Health and Welfare,* 520 S.W.2d 182, 184[3] (Mo.App.1975). The judicial [circuit court] review of such a case is from the decision of the administrative tribunal [*Edmonds v. McNeal,* 596 S.W.2d 403, 407[1] (Mo. banc 1980); Rule 100.07(b)] and determines, among other inquiry, whether the agency action rests on competent and substantial evidence upon the whole record [§ 536.140.2; *St. Louis County Police Officers Union Local 844 v. Gregory,* 622 S.W.2d 713 (Mo.App.1981)]. In a noncontested case, on the other hand, the administrative body acts on discretion or on evidence not

formally adduced and preserved. *Farmer's Bank of Antonia v. Kostman,* 577 S.W.2d 915, 921[4–10] (Mo.App.1979). The circuit court on such a "review" has no record to review [*Karzin v. Collett,* 562 S.W.2d 397, 399[2] (Mo.App.1978)], and thus owes no deference to conform doubtful evidence to the administrative decision [*Board of Education, Mt. Vernon Schools v. Shank,* 542 S.W.2d 779, 781[2–6] (Mo. banc 1976)]. The circuit court on "judicial review" of a non-contested agency decision, rather, exercises a parity of function with the administrative tribunal in a contested case: to hear evidence on the merits of the case, to find the facts, and to make a record. *State ex rel. Leggett v. Jensen,* 318 S.W.2d 353, 357 (Mo. banc 1958); *State ex rel. Wilson Chevrolet, Inc. v. Wilson,* 332 S.W.2d 867, 870 (Mo. 1960). The circuit court on a Rule 100.08 review, in short, conducts a hearing *de novo* on an original action *to determine post hoc on the facts as found by the court* whether the administrative decision conforms to the constitution, the laws, and is not otherwise "unreasonable, arbitrary or capricious or involves an abuse of discretion." § 536.150; *State ex rel. Walmar Investment Co. v. Mueller,* 512 S.W.2d 180, 182[1] (Mo.App. 1974); *State ex rel. State Tax Commission v. Walsh,* 315 S.W.2d 830, 832 (Mo. banc 1958).

Thus, the circuit court under § 536.150 and Rule 100.08 does not *review* evidence but *determines* evidence, and on the facts as found adjudges the validity of the agency decision. Thus, the adjudication of the circuit court on review of a noncontested case does not search for "competent and substantial evidence to support the decision" [the terminology employed by the memorandum of judgment and apt only for the judicial role on review of a contested case], but acts as an independent tribunal to give judgment from the evidence—*in view of the facts as they appear to the court.* Rule 100.08(a); § 536.150.1; *State ex rel. Leggett v. Jensen,* 318 S.W.2d 353, 356[2] (Mo. banc 1958). That the statute and counterpart rule withhold from the circuit court the prerogative to "substitute its discretion for discretion legally vested in such

administrative officer or body" does not abridge the role of the court as factfinder but rather confines the judgment to exclusively legal considerations. That scheme of statute and rule acknowledges that an administrative agency exercises mingled powers, judicial and legislative or executive [*State ex rel. Chicago, Rock Island & Pacific Railroad Company v. Public Service Commission,* 312 S.W.2d 791, 796[1, 2] (Mo. banc 1958); *State ex rel. Hotel Continental v. Burton,* 334 S.W.2d 75, 85 (Mo.1960)] and takes care that a court does not exercise that legislative or executive authority, so to avoid infringement of the constitutional separation of powers. *See* Shewmaker, Procedure Before, and Review of Decisions of, Missouri Administrative Agencies, 37 V.A.M.S., pp. 145–149 (1953); *State Tax Commission of Missouri v. Administrative Hearing Commission, et al.,* 641 S.W.2d 69 (Mo. banc, 1982).

The statutes, rules and precedents which define and measure the role of the circuit court on review of an administrative contested case codefine and comeasure the role of the appeals court. Thus, neither the circuit court under § 536.140.1 nor the court of appeals from the judgment of the circuit court reviews *de novo* [*Michler v. Krey Packing Co.,* 363 Mo. 707, 253 S.W.2d 136, 141[5–7] (banc 1952)]; rather, *each* reviews the decision of the agency [*Edmonds v. McNeal,* 596 S.W.2d 403, 407[1] (Mo. banc 1980); *Moran v. Whaley,* 608 S.W.2d 446, 448[3, 4] (Mo.App.1980)], *each* defers to the administrative adjudication [*McCallister v. Priest,* 422 S.W.2d 650, 658[7–11] (Mo. banc 1968)] and *each* must sustain the agency decision unless the contestant by cogent evidence proves that the determination does not rest on competent and substantial evidence or is otherwise not valid [*Marshfield Community Bank v. State Banking Board,* 496 S.W.2d 17, 26[19–26] (Mo.App.1973); *Johnson v. Watkins,* 298 S.W.2d 535, 538[2, 3] (Mo.App.1957)]. These strictures on judicial review, by the circuit court and the court of appeals, reflect the manner in which the mixed governmental powers are exercised by an administrative body in a

*contested* case and protect against judicial incursion of those separated powers.

The statute and rule which define and measure the role of the circuit court on review of an administrative noncontested case, however, do not codefine and comeasure the role of the appeals court. Nor has the role of the court of appeals on review of a judgment of the circuit court in a noncontested case been authoritatively determined. The circuit court "review" of a noncontested case under § 536.150 and Rule 100.08 admixes the traditionally separate trial and appellate functions and confers them both on the circuit court. The petition for review under that procedure, whether by writ or other action, constitutes an original proceeding, involves a determination of facts *de novo,* and on that evidence yields an independent judgment as to the lawfulness of the agency decision.[1] The review of a *contested* case by express statute and rule is to the court. § 536.140.1 and Rule 100.07(a). That judicial review, at whatever plane of appeal, is tempered by the provision of constitution that in a case in which a hearing is required by law, judicial review shall include the determination whether the *final administrative decision* is supported by competent and substantial evidence upon the whole record [Mo. Const. Art. V, § 18, amended August 3, 1976]. Thus, a court of appeals reviews not a judgment, but a final administrative decision. *Wood v. Wagner Electric Corporation,* 355 Mo. 670, 197 S.W.2d 647, 649[1–5] (banc 1946). That is to say: the circuit court in a contested case performs the exclusive role of a court of review and as such may not substitute its judgment as to the weight the administrative body accords the evidence. *State Board of Registration for the Healing Arts v. Masters,* 512 S.W.2d 150, 157[1–3] (Mo.App.1974). The review of a *noncontested* case is also to the court, and also by express statute and rule. § 536.150.1 and Rule 100.08(a). The circuit court in review of a noncontested case, however, reaches judgment without reference to the adjudicative information on which the administrative decision issued. It receives evidence on the merits of the case the contestant presents and finds the facts as they appear to that court to determine the validity of the agency decision. It owes no deference to facts found or credibility assessed [as in a contested case]—an exercise not performed by the agency to come to decision—but is bound only not to substitute judicial discretion for discretion legally vested in the administrator. Rule 100.08(a); cf. Rule 100.-07(c). The judgment the court of appeals reviews, therefore, culminates from an assessment of witnesses and facts found by the circuit court and questions of law determined. The deference the court of appeals owes, therefore, rests on the opportunity of the circuit court to assess the witnesses and their credibility. That is the adjudication we review—the judgment of the circuit court—and not, as in a contested case, the decision of the agency. The usual rule in a contested case—that the scope of review of the appeals court of an administrative decision coincides with that of the circuit court [*Vlasak v. Alternative System of Police Retirement System of St. Louis,* 435 S.W.2d 726, 729[1, 2] (Mo.App.1968)]—cannot appertain to a noncontested case. That is simply because the court of appeals does not hear witnesses or assess credibility. *Cusumano v. Outdoors Today, Inc.,* 608 S.W.2d 136, 139[4, 5] (Mo.App.1980).

The judgment the circuit court renders under § 536.150 and Rule 100.08, albeit distinctive in subject matter and therefore in scope, is of the essential quality of other judgments declared in a case tried to the court without a jury. The established procedure for the appellate review of such a

1. § 536.150.1 and Rule 100.08(a):

"[T]he court may determine whether such decision, in view of the facts as they appear to the court, is unconstitutional, unlawful, unreasonable, arbitrary or capricious or involves an abuse of discretion." These are all issues of law. The "review" of the circuit court, therefore, once the role of factfinder is discharged, addresses only questions of law. *Fritzsche v. East Texas Motor Freight Lines,* 405 S.W.2d 541, 544[4–6] (Mo.App.1966); *Horrell v. Chase Hotel,* 174 S.W.2d 881, 886[5] (Mo.App.1943); *Howlett v. Social Security Commission,* 347 Mo. 784, 149 S.W.2d 806, 809[7, 8] (banc 1941).

case is as defined by Rule 73.01 and as explicated by *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). There is no supersedence by constitution or rule or statute [as in the case of judicial review of a contested case] to the operation of Rule 73.01[2] to the appellate review of a circuit court judgment in a noncontested case, and every logic commends it. Accordingly, the *court of appeals reviews the judgment of the circuit court* to determine whether the adjudication that the administrative decision was or was not "unconstitutional, unlawful, unreasonable, arbitrary or capricious or involves an abuse of discretion" [§ 536.150.1 and Rule 100.-08(a) ] rests on substantial evidence and validly decides the questions of law.[3] In that exercise, the court of appeals—unlike the review of a contested case—may weigh the evidence before the circuit court when the record engenders a firm belief that the

judgment is wrong. *Murphy v. Carron,* supra, l.c. 32[1–3].

The circuit court adjudication we review presents only whether, in the perspective of the evidence adduced to that court, the School District construction of the Tentative Agreement to intend a termination date of July 8, 1977, for the employee Phipps rests on substantial evidence, if a question of fact, or was a valid conclusion of law—if otherwise. There is no contention that the procedures of decision were not lawful or that the agency exercised a legitimate power unlawfully. Nor does any consideration of administrative discretion color the decision, and hence judicial review. The dispute the administrative agency [School District] resolves, quite anomalously, involves the Tentative Agreement accord to which the agency itself is signatory. Thus, the administrative decision was

---

2. Rule 73.01(c)
   On appellate review:
   (1) The court shall review the case upon both the law and the evidence as in suits of an equitable nature.
   (2) Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses.

3. Our discussion notes that the role of the court of appeals on review of a noncontested administrative decision under § 536.150 and Rule 100.08 remains to be defined. A recent decision of the Southern District touches the question, but only as dictum. In that case, *Newcomb v. Patton,* 608 S.W.2d 145 (Mo.App. 1980), a physician appealed from the denial by hospital trustees of staff privileges. The circuit court found on review of that uncontested case under Rule 100.08 that the physician verbally harrassed and threatened the hospital administrator, and so the denial of staff privileges to the contestant physician was justified. The physician contended [anomalously] that the review by the court of appeals of a Rule 100.08 noncontested administrative case was confined to the basis for judgment assigned by the circuit court but that the constitutional argument of free speech [although not presented to the circuit court?] inhered in the litigation and so was open for determination by the court of appeals.

The court of appeals explained that the circuit court review under Rule 100.08 was "in effect a hearing *de novo* . . . to allow the development of that order of record which would be made in a 'contested' case." The court of appeals in *Newcomb* then inadvertently lapsed into the vocabulary of a *contested* case with

the comment that on such a review the court of appeals [l.c. 146]

must look to the *whole* record to determine whether the decision was supported by competent and substantial evidence, whether it was arbitrary and capricious or whether the administrative body abused its discretion. We are required to consider all the evidence in a light most favorable to the administrative body, giving it the benefit of all reasonable inferences to be drawn therefrom.

That the comment was a lapse is accented by the citation in support—*Hermel, Inc. v. State Tax Commission,* 564 S.W.2d 888 (Mo. banc 1978), a *contested* case under § 536.140 and Rule 100.07.

The court of appeals in a *contested* case, of course, reviews the administrative decision and not the judgment of the circuit court. *Gaffigan v. Whaley,* 600 S.W.2d 195, 198[4] (Mo.App. 1980). The court of appeals in a *noncontested* case, as our rationale has it, reviews the judgment of the circuit court on the record of the evidence developed by that tribunal, and so owes deference only to that adjudicative process—and not to the decision of the administrator culminated without an adjudication of the facts.

The court of appeals, in any event, dismissed the *Newcomb* appeal as moot. The period of the staff privileges the plaintiff contended were denied him had lapsed at the time of appeal. Thus, the comment as to the scope and nature of review by the court of appeals in a noncontested case stands as dictum and without precedential authority.

not only by a partisan to the contract, but adjudicates what the agreement intended in order to come to the determination that July 8, 1977, and not April 25, 1977, was the termination date applicable to the reinstatement status of nonteacher employee Phipps. That process of decision presumably delves not only the true intent of the labor union signatory but its very own, if not from the language of agreement, then from the circumstances. The contention of the plaintiff Phipps was an administrative concern at all simply because the terms of the Tentative Agreement [¶ 8] required that "[a]ll alleged breaches of this agreement will be processed through the agreed upon grievance procedures." [*See Phipps v. School District of Kansas City*, 588 S.W.2d 128, 133 (Mo. App.1979).]

The doubtful *competent and substantial evidence* and *whole record* terminology of the memorandum of judgment notwithstanding, the circuit court heard witnesses, entered findings of fact and, implicitly, conclusions of law—as the circuit court review of a noncontested administrative case under § 536.150 and Rule 100.08 contemplates. The court found, among others, the facts already cited:

> On April 25, 1977, a School District employee of twenty-four years, held the position of custodian-fireman at the wage of $4.70 per hour.

> On March 20, 1977, the teachers of the School District went on strike.

> On *April 25, 1977*, Phipps among some 140 nonteacher personnel refused to cross the picket line and was terminated because of absence from duty during the strike.

> On May 6, 1977, in obedience to circuit court order, the terminated nonteacher employees were permitted to return to work.

> On June 17, 1977, after an evaluation of his work performance, Phipps was demoted to custodian I at reduced pay.

> On June 27, 1977, the court of appeals prohibited the circuit court order of May 6, 1977.

> On *July 8, 1977*, the terminations were made effective once again as of that date by the School District as to Phipps and the others terminated on April 25, 1977 and who thereafter resumed work under the May 6, 1977 order of the circuit court.

> On July 13, 1977, a class action suit [Phipps included] was brought by an officer of the union against the School District under § 1983 of the Civil Rights Act for unlawful termination of the nonteacher personnel.

> On September 2, 1977, on the application by Phipps for reappointment to Custodian-Fireman [the position he held on April 25, 1977] the School District offered to reappoint him to custodian I [the demoted position he held on July 8, 1977] for the usual period of twelve months.

The court found further that negotiations between Local No. 12 [bargaining unit on behalf of Phipps and the other terminated nonteacher personnel] and the School District consummated in the "Tentative" Agreement. That agreement, the court found, provided:

> All employees terminated effective *April 25, 1977 and/or July 8, 1977* will be permitted to apply for reappointment to the positions from which they were terminated.

> [and]

> [E]ach person who applies for reappointment by delivering to the District a *completed form requesting reappointment* shall be reappointed to a position with the same salary as that position held with the District on the date of termination. [emphasis added]

The "form requesting reappointment" included the phrase: "I, _____, hereby apply for re-appointment to the job I held prior to *March 20, 1977.*" [emphasis added] The court found that the Tentative Agreement was the product of the parties as joint drafters, but that the phrase *and/or July 8, 1977* was included as a term at the insistence of Local No. 12. The court found also that the "form requesting reappointment" [which recited March 20, 1977 as the

reappointment date] could not be attributable exclusively to either party, but was not, in any event, an integral component of the Tentative Agreement.

The court then concluded [albeit haltingly] that the *April 25, 1977 and/or July 8, 1977* termination dates of the Tentative Agreement were not ambiguous, but if ambiguous, then that doubt was to be resolved in favor of the School District, since Local No. 12 insisted on the inclusion of the July 8, 1977 date. The court then prefaced judgment with the ultimate conclusion:

> [T]hat the defendant [the School District as administrative decision-maker] could reasonably have found under the terms of the parties' "Tentative Agreement" that the correct termination date upon which to base its re-appointment or offer to re-appoint plaintiff was July 8, 1977 and that its decision to do so and to subsequently deny plaintiff's grievance therefrom is supported by competent and substantial evidence and should be affirmed.

That conclusion misconceived the circuit court judicial function in the review of a noncontested case under § 536.150 and Rule 100.08. That procedure requires the circuit court to *find the facts* [Rule 100.08]

> relevant to the question whether such person at the time of such decision was subject to such legal duty, or had such right, or was entitled to such privilege ... and the *court may determine whether such decision, in view of the facts as they appear to the court, is unconstitutional, unlawful, unreasonable, arbitrary or capricious or involves an abuse of discretion. . . .*
> [emphasis added]

The circuit court heard evidence, as the statute and rule contemplate, and found subsidiary facts, but not the salient fact of the termination date intended by the Tentative Agreement to apply to a contract beneficiary in the position of Phipps—a School District employee terminated on April 25, 1977 then reinstated under compulsion of court order, then again terminated on July 8, 1977. That adjudication of decisive

fact—apparently as a gesture of deference—was conformed to the decision of the administrator that the agreement intended that Phipps be restored to his July 8, 1977 status. The dispute before the administrator was as to the intention of a contract term—a question of fact, whether from the "plain" terms and so beyond dispute, or in dispute and so from extraneous evidence— as the court here proceeded. There was no occasion for deference to an administrative adjudication of fact because there was none. There was no occasion even for deference to an agency expertise, because the subject matter was adventitious. Nor was there deference due the administrative decision as an exercise of a mingled power, since the construction of the contract involved a judicial function only. *Johnson v. Priest*, 398 S.W.2d 33, 36[3] (Mo.App.1965); *Citizens for Rural Preservation, Inc. v. Robinett, Chairman*, 648 S.W.2d 117 (Mo.App. 1982); Shewmaker, Procedure Before, and Review of Decisions of, Missouri Administrative Agencies, 37 V.A.M.S., p. 149 (1953).

The rationale that the evidence-adjudicator must enter findings of fact upon which the agency decision issues or is justified rests on the several premises: that the procedure facilitates judicial review, prevents a judicial incursion into legislative [or executive] functions, protects against arbitrary action, and confines the agency to a lawful jurisdiction. *Century State Bank v. State Banking Board of Missouri*, 523 S.W.2d 856, 859 (Mo.App.1975); 2 Davis, Administrative Law, § 16.05 (1958). In a *contested* case, the agency determines the facts, an exercise not only judicial but also mingled with legislative [or executive] discretion and expertise. To maintain the integrity of that mixed administrative function, and to avoid an unlawful encroachment, therefore, the court of appeals *reviews* the administrative decision—and not that of the circuit court which has no power to find the facts—for legal sufficiency and lawfulness. For that very reason, the court of appeals may not find a fact neglected by the agency, but essential to decision but must remand to the agency for that exercise of exclusive jurisdiction. *Michler v.*

*Krey Packing Co.,* 363 Mo. 707, 253 S.W.2d 136, 143 (banc 1952); *Stephen and Stephen Properties, Inc., v. State Tax Commission,* 499 S.W.2d 798, 804[8, 9] (Mo.1973). In a *noncontested* case, the circuit court and not the administrator adjudicates the evidence, and the facts found are product of a judicial function only without mix of legislative or other governmental considerations—an exercise interdicted to a court. The court of appeals reviews the judgment of the circuit court—both as to the law and evidence components [Rule 73.01], and not the decision of the administrative body. In such a case, where the review shows that the findings of the circuit court neglects a fact essential to judgment, the judgment does not rest on substantial evidence and may not stand. *Murphy v. Carron,* 536 S.W.2d 30, 32[1–3] (Mo. banc 1976). The court of appeals, then [contrary to function in the review of a *contested* administrative case], may redetermine the facts and redeclare the law of the case. *Urban Expansion, Inc. v. Fireman's Fund Insurance Company,* 592 S.W.2d 239, 241[1, 2] and n. 2 at 242 (Mo. App.1979). The court of appeals will then enter the judgment the trial court should have found. *Monnig v. Lewis,* 617 S.W.2d 492, 497[3] (Mo.App.1981). Thus, the lapse of the circuit court to find as a fact the date the Tentative Agreement meant to apply to a beneficiary employee in the position of Phipps leaves the judgment of the circuit court without basis in substantial evidence and renders the administrative decision arbitrary as a matter of law. *Edmonds v. McNeal,* 596 S.W.2d 403, 407[3, 4] (Mo. banc 1980). Accordingly, our review redetermines the subject matter of the circuit court judgment: whether or not on the basis of the evidence before that court the agency decision was "unconstitutional, unlawful, unreasonable, arbitrary or capricious or involved an abuse of discretion."

The School District argues that, considered within the matrix of the statutes extant at the time of contract [which invest a school authority with discretion to manage employment affairs], the intention of the Tentative Agreement to apply the July 8, 1977 termination date to Phipps is clear, so that the circuit court judgment which adjudicates that result merely gives effect to an unambiguous agreement. That intention of agreement, the School District contends, obtains from the very terms and without resort to evidence. The grievant Phipps argues, on the other hand, that the Tentative Agreement is ambiguous as to the date which governs reinstatement of an employee-applicant: ¶ 2 recites merely that the reappointment shall be to the position and salary held *on the date of termination,* whereas ¶ 1 extends that benefit to employees terminated on two dates, *April 25, 1977 and/or July 8, 1977.* The grievant Phipps contends that to determine which of the two termination dates the contractors meant by the term—*on the date of termination*—involves not only the words of contract but also the extraneous circumstances which inform the terms. In that encompassed context, the grievant contends, the purpose of the contract becomes palpable: to restore the nonteacher employees to the *status quo ante* strike; that is, to the position and pay on the date of the termination which disrupted that status, April 25, 1977.

Thus, the litigants, although both signatory to the written words of the Tentative Agreement integration, each ascribes a different sense to the contract term *date of termination.* That condition of dispute alone, however, does not mark the Tentative Agreement ambiguous, any more than does the judgment of the circuit court conclude that opinion upon us. *Foley Co. v. Walnut Associates,* 597 S.W.2d 685, 688[1–6] (Mo.App.1980). The role of the court of appeals is to determine the meaning to be enforced, not by what the parties now say was intended [*Cure v. City of Jefferson,* 380 S.W.2d 305, 310 (Mo.1964)], but by what the words in context, the full circumstances at the contract formation event and the course of performance show the parties meant by the term of agreement. Restatement (Second) of Contracts, § 202, Comments b and d (1981); 3 Corbin, Contracts, §§ 535 through 544 (1960 & Supp.1982). In that inquiry, the court searches the language of agreement for a prevalent or common meaning so as to give effect to the disputed term according to that principal

contract purpose. Restatement (Second) of Contracts, § 201, Comments b and c; § 202, Comment c (1981). To ascertain the word-meaning of a contract term is only to derive the common understanding of the parties as to the term, and not to assess the legal effect of that meaning. It involves the interpretation, not the construction of a contract. Restatement (Second) of Contracts, § 200, Comment c (1981); 3 Corbin, Contracts, § 534 (1960 & Supp.1982). The rule of contract that the component words and terms are interpreted according to the full circumstances of the manifestation of intent event does not depend upon an ambiguity or nonambiguity [as the litigants contend, *pro* and *con*], but operates to give effect to the understandings and expectations of the contractors, ambiguity or not. Restatement (Second) of Contracts, § 200, Comment b; § 202, Comment a (1981).[4]

The Tentative Agreement was a negotiation of disputes induced by the strike by school teachers on March 20, 1977. The nonteacher personnel, Phipps among them, honored the strike and remained away from work. That personnel was terminated by the School District on April 25, 1977 for that absence. The circuit court order then reinstated them, but not all of those terminated chose to return. Phipps, a returnee, was demoted upon evaluation of work performance. Our decision nullified the directive of the circuit court, and those employees who returned were again terminated by the School District on July 8, 1977. That *en masse* dismissal was challenged in the federal district court by a class action [which included Phipps] as a violation of civil rights. In this state of affairs, attorneys for the School District induced a labor union official, Eisler, to mediate the contentions with Local 12, representative for the nonteachers—Phipps among them. Eisler conferred with the School Board lawyers who submitted a list of "major points" to serve as a basis for a resolution of the disputes. The first of them [as the typewritten draft shows] proposed: "All employees terminated effective April 25, 1977 will be permitted to re-apply for the positions from which they were terminated." The second of them [as both the typewritten proposal and handwritten attorney notes show] proposed: "The District reserves the right to refuse employment to those persons whose acts exceeded peaceful participation in the teachers [sic] strike."

Eisler then met with both, counsel for the School District and counsel and representatives of Local 12, to discuss the "major points" proposal. They made a change or two, and concluded the Tentative Agreement which was then ratified by the School Board and the Local 12 membership. A change suggested by the Local 12 counsel was to modify the proposed language: "[a]ll employees terminated effective April 25, 1977" to "[a]ll employees terminated effective April 25, 1977 and/or July 8, 1977." Thus, the second "major point" was integrated into the Tentative Agreement as ¶ 4 in the exact terms of the proposal, but the first "major point" was integrated into the Tentative Agreement only after modification.

No one doubts that the Tentative Agreement was for the benefit of only those nonteacher employees whose support of the strike was peaceful. The preliminary notes of agreement and the testimony of Board member Stark confirm that purpose, and the final integration of agreement declares it. The issue here, rather, is whether the matrix of circumstances at the time of the contract formation process, the final contract terms in context, and the conduct of the parties in performance of the contract disclose a principal purpose in common

4. Restatement (Second) of Contracts, §§ 200, et seq. (1981) reconstitute former Restatement of Contracts, §§ 226 through 234, et seq. (1932), to conform the earlier sections to the more contemporary contract formation decisions, scholarship and terminology. See: Reporter's Notes to §§ 200, 201 and 202, et seq., of Restatement (Second) of Contracts 1981. The rephrases intend to make clear, among other refinements, the distinction between *interpretation* [meaning] of agreement and *construction* [legal effect] of agreement, and the judicial role as to each. See, also: 4 Williston, Contracts, §§ 600–602 (3 ed. 1961), and 3 Corbin, Contracts, §§ 532–535 (1960 & Supp.1982). The decisions we cite, *Foley* and *Cure, supra,* predate the reconstituted sections and so employ the former Restatement expressions of principle, but to essentially the same effect.

so as to invest the *April 25, 1977 and/or July 8, 1977* term with a meaning compatible with and in furtherance of that mutual understanding of purpose. The circuit court found that since the *and/or July 8, 1977* language was introduced into the contract by the labor union, whatever ambiguity inhered in the termination date resulted from that modification, and any doubt must be resolved in favor of the School Board contractor. [The court then, as we note, failed either to find as a fact, or construe as a matter of law, the termination date [or dates] but merely accepted the administrative decision as a plausible resolution of the evidence.] The *contra proferentem* principle of construction, of course, allows a court to resolve ambiguous language against the party who selects the language [*John Deere Company v. Hensley,* 527 S.W.2d 363, 365[2] (Mo. banc 1975)], but there must be an ambiguity [*Nation-Wide Check Corp. v. Robinson,* 479 S.W.2d 192, 194[6] (Mo.App. 1972)], a determination which becomes necessary only if *interpretation* of the term in question does not yield a meaning understood in common by the parties.

▆ The labor party to the contract inserted the *and/or July 8, 1977* term to ensure that *all* the nonteacher employees terminated on April 25, 1977—even those who did not return under the circuit court order only to be released once again on July 8, 1977 after the decision of the court of appeals nullified the circuit court directive—were included in the reinstatement offer of the Tentative Agreement. The testimony of School District Assistant Superintendent of Personnel MacNeven makes that clear. That the School District treated the July 8, 1977 release as merely the reinstitution of the formal April 25, 1977 termination [and thus that the contractors both understood the reinstatement was to the employment status on that date] is clear from the circumstances antecedent to the contract formulation, as well as their conduct thereafter in performance of the contract. The testimony of School District Board member Stark was that the employees were reinstated despite the April 25, 1977 termination only under compulsion of the circuit court order. The School Board, however, persisted to believe that the April 25, 1977 was a valid action and pursued that assertion of right, successfully, in the court of appeals. The School Board then instructed to terminate again: "so that our position would be very clear that *the action of April was the intention of the Board in July.*" [emphasis added] The letter which Assistant Superintendent MacNeven then issued to implement the Board decision recited:

Your employment with the School District of Kansas City, Missouri, was terminated last April 25, 1977. Pursuant to Court orders, you were later reinstated. The Court order which led to your reinstatement has since been voided by action of the Missouri Court of Appeals. *Your termination is, therefore, again made effective* at the close of business *on July 8, 1977.*
[emphasis added]

That the prestrike *status quo* was the principal purpose of the contract as to those nonteachers whose absence was peaceable—and hence that the contractors understood that the reinstatement was defined by status on April 25, 1977, is shown by other evidence.

The Tentative Agreement provided that an employee apply for reinstatement by delivery of a "completed form requesting reappointment . . . to a position with the same salary as that position held with the District on the date of termination." The form used for that purpose was in these terms:

APPLICATION FOR REAPPOINTMENT

I, _____ , hereby
(Print your name and employee number)
apply for reappointment to the job I held prior
to March 20, 1977. My job was:

JOB TITLE: _____

LOCATION: _____

_____
(Sign your name)
_____
(Print your address)

Before September 2, 1977 return this application to:

Division of Personnel
School District of Kansas City, Mo.
1211 McGee Street
Kansas City, Missouri 64106
[emphasis added]

The evidence of witness Walker, Local 12 official was that the Application for Reappointment form was agreed to by the parties, but he could not recall whether the form was attached to the Tentative Agreement when that document was ratified by the union members. The School District signatory to the Tentative Agreement, Assistant Superintendent MacNeven confirmed that the form was not a part of the agreement submitted for ratification. There was also intimation by the School District that the form was not agreed to, but no evidence contradicted that assertion by the union negotiator. There was no evidence as to who drafted the form. The circuit court concluded that the form was not an attachment to the Tentative Agreement when ratified, and therefore was not an integer of the contract. That determination, to all apparent effect, prompted the circuit court to discount the effect of the form on the principal issue—the interpretation of the *date of termination* terminology of the Tentative Agreement.

That the form was not part of the contract for the purpose of the *construction* of the legal effect of the Tentative Agreement does not bear on the relevance of the form in the *interpretation* of the *April 25, 1977 and/or July 8, 1977* term of that agreement. The Restatement (Second) of Contracts (1981), § 202, Rules in Aid of Interpretation advise, not only that

(1) [w]ords and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight,

but also

(2) [a] writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.

That the written Application for Reappointment form was part of the Tentative Agreement transaction, whether or not an integer of the contract proper [but see, *Three-O-Three Investments, Inc. v. Moffitt,* 622 S.W.2d 736, 738[3, 4] (Mo.App.1981)], is evident. The Tentative Agreement itself refers to *a completed form requesting reappointment* as a precondition to reinstatement under the agreement. That the School District adopted the form *de facto* as the application for reinstatement under the Tentative Agreement is shown from the testimony of Walker and Phipps who were reappointed upon submission of the completed form. The evidence allows the inference only that those nonteacher employees reinstated were restored under the auspices of a form which requested *reappointment to the job I held prior to March 20, 1977* [the date of the strike]. That course of performance by the parties, School District as well as Local 12, *after* the execution of the Tentative Agreement, is cogent evidence of the common meaning both attributed to the *date of termination* terminology of the contract. Restatement (Second) of Contracts, § 202, Comment g (1981); *Grantham v. Rockhurst University,* 563 S.W.2d 147, 150[2–11] (Mo.App.1978).

The evidence of mediator Eisler was to like effect: that the discussions between the School District and labor union negotiators intended reinstatement of the nonteacher personnel "to the salary they were receiving prior to the beginning of the teachers' strike."

The depiction of the circumstances as they appeared to the parties at the time of contract as the final expression of agreement shows a consistent common understanding of purpose to reinstate all nonteacher personnel whose support of the strike was peaceful to the work status occupied before that disruption. The actual performance of the contract was in terms of that mutual understanding. In that full perspective, each party knew or had reason to know that the *date of termination* meant April 25, 1977, and that to them the *April 25, 1977 and/or July 8, 1977* language was devoid of ambiguity.

The School District argues, nevertheless, that to interpret the Tentative Agreement to an effect which restores Phipps to the custodian-fireman position held on April 25, 1977, rather than to the July 8, 1977 custodian I status to which he was demoted for job performance, not only infringes the lawful authority of a School District to manage employee tenure and other school affairs, but also the provision of the Tentative agreement [¶ 2]:

> Nothing in this agreement shall be construed to restrict the District's responsibility to assign personnel to those positions which are in the best interests of the District in accordance with Board Policy.

The Tentative Agreement, no less than the Phipps demotion action, is an expression of the legitimate authority of the School District to manage school personnel affairs. The grievance before the administrative agency, then before the circuit court, and now on appeal, is for the breach of the Tentative Agreement, and not to correct an agency decision to demote. The purpose of agreement, as the evidence shows both parties to understand, was to restore *all* nonteacher personnel who observed the strike peacefully to the status of employment before the strike. The School District observes correctly that neither Phipps nor any other, *qua* nonteacher employee, was in the contemplation of the negotiators during the contract formation process. The Tentative Agreement, rather, was for the members of a class—which encompassed *Phipps among* the others. It was the dismissal of suit by that class in the federal court which was a *quid pro quo* for the Tentative Agreement restoration of *ante* strike employment status to those of the class whose acts did not exceed peaceful support for the strike. The excerpt from the Tentative Agreement the School District cites suggests no condition— as a term of agreement—that restoration depend upon satisfactory work performance in that classification. That excerpt in context of the full contract paragraph, rather, explains that the promise to restore the nonteachers to the pre-strike work and pay status does not "guarantee his or her exact same position or working location", but confirms the responsibility of the School District to assign positions in accordance with "the best interests of the District and in accordance with Board Policy"—that is, according to lawful discretion.

Nor does the solitary comment of Board member Stark that the discussions considered as conditions for rehire, not only those whose conduct remained within "the bounds of peaceable participation [in the strike]", but also those with "good work records" sustain the contention that restoration of Phipps to a position from which he had been reduced contradict the purpose of agreement. No other evidence confirms it. The subject of good work record was not an item of agenda; the "major points" of preliminary discussion do not encompass it, nor does the written integration of the negotiations—the Tentative Agreement. If we assume, for argument, that the contractors understood as an implicit term of the Tentative Agreement that only personnel with good work records were eligible for reinstatement—the refusal to rehire to pre-strike status becomes an assertion of right *under that contract,* and so by the very terms of *that contract* [¶ 8] a subject for redress by grievance. The School Board contends, not for a *right due* under the Tentative Agreement, but that an administrative decision of unsatisfactory work performance and demotion unrelated to the Tentative Agreement [or even contemplated by the negotiators as the School District insists] shall adjudicate the contract.

The School District makes no response [were that even legitimate] that the Phipps grievance fails of merit *under the contract* because the worker was not qualified for reinstatement by reason of poor work performance, but only that to interpret *date of termination* to mean April 25, 1977, results in reappointment of a worker since determined by administrative decision incompetent for that position. That the Tentative

Agreement may yield such an anomaly is merely incidental to the purpose understood and meant for the terms of agreement by the parties in common. The evidence of the contract formation process, the text of agreement, the course of performance are all of a consistent temper: that the parties meant their agreement to restore to each peaceable worker the position and pay held on April 25, 1977, the *date of termination* on account of excessive absences from work due to strike observance. That the grievance presents a question of contract only— the interpretation of the term *date of termination*—was acknowledged by the parties to the circuit court. We conclude that question against the contention of the School Board.

We determine that the circuit court judgment does not rest on substantial evidence and so erroneously declares under Rule 100.08 judicial review that the decision of the School Board to deny the Phipps grievance was not "unconstitutional, unlawful, unreasonable, arbitrary or capricious or did not involve an abuse of discretion."

■ The assessment of damages remains. The grievant Phipps rejected the School District offer for reappointment as custodian I at $3.80 per hour. The tender to resume employment on those terms to commence September 7, 1977 was rejected by Phipps as in breach of the Tentative Agreement. Our decision sustains that grievance. Phipps has not worked for the School District since then. He has worked interim employments interspersed with times of idleness. He has earned wages as well as accepted unemployment compensation. Those public benefits amounted to $105 per week, but neither the duration nor total unemployment compensation was in evidence. The wages earned during the periods of employment exceeded the regular pay for the custodian-fireman position with the School District. The wage benefits accruable on April 25, 1977 to a custodian-fireman with some twenty-four years of service and thereafter, although determinable from the Operating, Maintenance & Warehouse Employee Handbook [issued by the Department of Personnel of the Kansas City School District] in evidence, were not defined sufficiently as a basis for damages. That wage escalates according to classification within a job status, longevity and other variables, and the criteria are valid for that year of publication only. On the developed record, we are not able to determine the compensation due Phipps under the employment to which the Tentative Agreement restores him. It is evident that the wages Phipps earned during that interim will mitigate any compensation due from the School District for breach of the contract. *Wessler v. City of St. Louis,* 242 S.W.2d 289, 290[2] (Mo.App.1951). Whether the unemployment compensation received by Phipps may reduce the damages due otherwise from the School District depends upon whether that was received from a collateral source, in which case the School District may not benefit [*Burens v. Wolfe Wear-U-Well Corporation,* 236 Mo.App. 892, 158 S.W.2d 175, 178[3–5], 179 (1942)], or whether the collateral source was the School District itself, in which case Phipps may not double the benefit. [*Overton v. United States,* 619 F.2d 1299, 1306[9, 10] (8th Cir.1980).

■ The measure of damages for the breach of an employment contract is *prima facie* the agreed contract price for the services to be rendered, less the income the employee earned—or with diligence could earn—during the life of the contract. *McGee v. St. Joseph Belt Ry. Co.,* 232 Mo. App. 639, 110 S.W.2d 389, 392[10] (1937); 56 C.J.S., Master and Servant, § 11d (1948). The circuit court adjudged that the contract term was for one year, and the School District asserts that limitation on damages on appeal. The Tentative Agreement offers to reappoint without condition of term or time. The notice of appointment [consequent to the conclusion of the Tentative Agreement] from the School District to Phipps to the demoted custodian I position [spurned by Phipps and the subject of this grievance] announces:

YOU ARE HEREBY APPOINTED TO POSITION OF CUSTODIAN I–NORTH-EAST HIGH SCHOOL AT A SALARY

OF $3.80 PER HOUR. THE APPOINT-
MENT WILL BE EFFECTIVE FOR A
12-MONTH PERIOD BEGINNING SEP-
TEMBER 7, 1977....

There is no explanation in the evidence for
the twelve-month term of employment.
The Tentative Agreement does not contain
such a term. The contract formation proc-
ess does not disclose one, nor did the negoti-
ations contemplate any tenure other than
that which obtained before the strike. The
School District gave the limitation of term
and time no heed in any event. Assistant
Superintendent McNeven testified to that
effect:

> Q. Isn't it true that despite the fact that
> initial appointments of these persons
> was for a one-year period, most of the
> employees who were reappointed pur-
> suant to the agreement between Local
> 12 and the School District continued to
> be employed by the School District af-
> ter the twelve-month period of their
> initial employment?
>
> A. *Yes, typically, the employment is
> continuing.*
>
> Q. Isn't it true that for non-certified
> employees such as custodians, mainte-
> nance workers and cafeteria workers
> that unless there is a reduction in the
> force or a just cause for termination,
> that those employees are normally
> reemployed from year to year?
>
> A. *Most of them are.*
>
> Q. Well, can you think of any reason
> other than a reduction in force—and in
> reduction in force I would include elim-
> ination of a program—can you think of
> any reason besides reduction in force or
> termination for just cause which would
> prevent an employee in the non-certi-
> fied work group from being reappoint-
> ed from year to year?
>
> A. Closing of a school.
>
> .    .    .    .    .
>
> Q. But absent one of those contingen-
> cies [reduction in force, failure to per-
> form the duties, resignation by the em-
> ployee, or death] non-certified employ-
> ees *in the normal course of things are
> reappointed from year to year, is that
> correct?*

> A. *Yes.*
>
> [emphasis added]

The reappointment under the Tentative
Agreement was to the pre-strike status and
employment practices that evidence de-
scribes.

The judgment of the circuit court is re-
versed and the cause is remanded for deter-
mination of damages only.

All concur.

## ON MOTION FOR REHEARING

PER CURIAM:

The motion for rehearing presents no
matter not already argued, taken up and
answered in the opinion. In the brief, as
well as on rehearing, the School District
insinuates the argument that to construe
the Tentative Agreement, as we do, to
mean that the *date of termination* [and
hence, of rehire under the agreement] was
April 25, 1977, infringes the legislative au-
thority of that public body, and so comes
under the interdiction of *City of Springfield
v. Clouse,* 356 Mo. 1239, 206 S.W.2d 539
(banc 1947). That follows [we assume the
argument means] because then Phipps, who
was fired along with the other some one-
hundred-or-so nonteachers for work ab-
sence, and was then rehired under the com-
pulsion of the circuit court order we later
invalidated, and was in that interim demot-
ed for work performance, would be restored
to his original work status—a result which
nullifies the School Board decision to reduce
Phipps.

Our opinion responds to that contention,
and in the usual course, the reassertion on
motion for rehearing would constitute rear-
gument and merit only disregard. Rule
84.17. In the interim since opinion and the
motion for rehearing, however, our Su-
preme Court in *Sumpter v. City of Moberly,*
645 S.W.2d 359 (Mo. banc 1982) explicated
*Clouse* further. The opinion was not
available to either party. In the interest of
fairness, we reconsider the contention of
the School District in the perspective of

*Sumpter.* We conclude, as before, that neither *Clouse* nor [now] *Sumpter* impinges on our decision.

*Clouse* holds, and *Sumpter* follows, that the Missouri Constitution prevents the legislature or other public body from the consummation of a collective bargaining contract to fix terms and conditions of the public employment. To do so violates the principle of the separation of powers and constitutes an unlawful delegation of the legislative authority. That interdiction applies as well to an administrative body. *Sumpter,* at p. 362; § 105.520. Neither *Clouse* nor *Sumpter* affects our opinion, for these reasons:

The *quid pro quo* for the Tentative Agreement [as its very terms declare] was the dismissal of the multicount § 1983 class action in the federal court to recover damages against the School Board for the *en masse* discharge of the nonteacher personnel, and not to set conditions of public employment by collective bargaining. It was to relieve that possibility of judgment which prompted the School District to probe for a settlement with the plaintiffs [coincidentally public employees] and to restore them to employment. The School Board does not disavow the Tentative Agreement, even now. It simply does not agree that the construction we give to its terms [a construction we discern from the intention the School Board itself meant and practiced for the *date of termination* terminology] should allow the incidental effect of restoration of employee Phipps to a position he lost in the interim by demotion. The School Board has insisted—and our opinion holds—however, that the singular position of Phipps was never a subject of contract discussion. The preoccupation was with the class who were the plaintiffs in the federal action—and coincidentally nonteacher public employees. The argument of the School Board reduces to an anomaly: not only was the consideration for the Tentative Agreement the dismissal of the federal court action, but the correlative effect was to restore the employees to the status and conditions of work set unilaterally by the public body *before* the teacher strike, *before* the

work absence in sympathy—and involved no collectively bargained modification of that unqualified legislative exercise. In fact, as our opinion notes—and as our quashal of the circuit court order shows [*School District of Kansas City v. Clymer,* 554 S.W.2d 483 (Mo.App.1977)], the legislative authority of the public body for autonomous acceptance, rejection, or modification of wage and work conditions has been confirmed throughout. Our opinion continues that vindication.

We assume, for argument, that the Tentative Agreement somehow constitutes a collectively bargained contract to fix terms and conditions of public employment and conclude nevertheless that neither *Clouse* nor *Sumpter* impairs our opinion. In that case, the Tentative Agreement—the contract, as such—does not bind the public body, but the formal action of the public body does. Moreover, that formal action continues to govern until superseded by another formal action. *Sumpter* states the principle [pp. 362–363]:

> Clearly, the decision in *Clouse* says that an administrative body cannot decide to and then enter into a collective bargaining agreement. Such action would violate applicable constitutional restrictions regarding separation of powers. It seems clear, therefore, that the General Assembly was saying in § 105.520 only that when a proposal is submitted to a public body [whether it be an administrative, legislative or other governing body], it has a duty to consider and act on such proposal. It may reject, modify or adopt. *If it decides to adopt the proposal, it does so by ordinance, resolution or other appropriate form,* depending on the nature of the public body. *The result will be an* administrative rule, an ordinance, *a resolution,* or something else *which governs wages and working conditions, but it will not be a binding collective bargaining contract.* [emphasis added]

Then, to give emphasis to this essential rationale, the majority adds in footnote 4:

Judge Seiler's dissent suggests that by this language the Court in holding that the ordinance adopted by the City Council has no binding effect. *This is not what we hold. The ordinance,* just as any city ordinance, *governs and is binding until changed by appropriate action. We hold only that this ordinance did not result in a collective bargaining contract which could be changed only with union approval.* [emphasis added]

The formal resolution of the School Board adopted the Tentative Agreement, so that the effect of that consensus [if not as a valid contract] was that of an "appropriate action" [*Sumpter,* supra] which lawfully governed the conditions of wage and work expressed in the Tentative Agreement. It was, if not an enforceable contract because a collective bargain as to the work and employment subject, then a legitimate exercise of legislative authority which continues in effect and binds "until changed by appropriate action." [*Sumpter,* footnote 4] The resolution of the School Board remains in effect. That public body does not repudiate the content of the resolution, even now. It does not ask to avoid the restoration of the nonteacher employee class to the prestrike status—terms and conditions of employment set by that public body autonomously. It does not ask for reinstatement of the federal court litigation. It does not claim that the innumerable nonteacher employees restored to employment under the Tentative Agreement [or, under the formal resolution] infringed a legislative sovereignty. It complains only that construction of a contract term which restores *all members of the class* to the prestrike status—as the resolution [or contract] expresses—but incidentally favors Phipps, infringes a legislative prerogative. Our opinion holds that the Tentative Agreement was an exercise of the power to settle litigation and that the benefit Phipps derived was an incident of that settlement. We conclude nevertheless for the reasons we give, that were the Tentative Agreement a contract collectively bargained, the express terms of the resolution which encompassed those terms was a legislative sanction of the restoration of employment—Phipps included—a sanction still in effect and so beyond any cavil.

The motion for rehearing is denied.