**1048**

Virgil MILLER, Plaintiff,

v.

JONES TRUCK LINES, INC., International Brotherhood of Teamsters, Chauffeurs, and Helpers, and Local 878, Teamsters, Chauffeurs, and Helpers, Defendants.

No. LR–76–C–284.

United States District Court,
E. D. Arkansas, W. D.

Sept. 28, 1979.

John W. Walker, Little Rock, Ark., for plaintiff.

R. F. Beagle, Jr., Paul Scott Kelly, Jr., Richard B. McKelvey, Kansas City, Mo., for Jones Truck Lines, Inc.

John P. Lavey, Little Rock, Ark., for Intern. Broth. of Teamsters, Chauffeurs & Helpers and Local 878.

Melva H. Kozinsky, Little Rock, Ark., for Teamster, Local Union 878.

OPINION

ARNOLD, District Judge.

This is a Title VII case tried to the Court on September 4, 5, 6, and 7, 1979. Although the complaint originally contained class-action allegations, they were abandoned before trial, and the case was tried as an individual claim.

The defendant Jones Truck Lines, Inc., is a common carrier engaged in interstate commerce. Its headquarters is at Springdale, Arkansas. It has 20 branches or terminals located throughout the South and Midwest. One of these terminals is at Little Rock, Arkansas, and Little Rock is the location of most of the events in issue. All of the corporate officers and managerial employees of defendant are white, and they always have been. Specifically, there has never been a black terminal manager, nor has there ever been a black supervisor or foreman, with the exception of one man in St. Louis. Defendant's employees at Little Rock fall into several categories: over-the-road drivers, city employees, including dock men and truck drivers who make local deliveries; sales people; shop employees, who service and maintain equipment; office employees; and supervisors, including a branch manager, an assistant branch manager, and three or four foremen. No over-the-road employees have ever been black,

and, as already noted, no supervisors at Little Rock have ever been black. In 1975, when the events specifically at issue here took place, there were ten black employees out of a total of 63 in the "city" category. That number has since expanded to 23 out of a total of 95.

The company is a government contractor and therefore must have an affirmative action plan. The company also has an equal employment opportunity coordinator, Milton R. Lindley, who is a vice-president and lives in Springdale. Mr. Lindley's principal responsibility is labor relations, and the company's affirmative-action efforts have been abysmally inadequate. Records are not properly kept. Numerical errors have been made in those records which do exist. Mr. Lindley has never had any particular training in equal employment opportunity matters, and he himself testified that the company's affirmative-action program, at one time, was "weak." The company has no specific goals for promoting blacks into management jobs, and no time table for achieving black representation among foremen. There are 170 over-the-road drivers in Arkansas, of whom none has ever been black. No blacks are presently employed as office workers in Little Rock, and no date has been set for attaining any degree of integration in this portion of the defendant's workforce.

The company is subject to a consent decree in a case styled *United States v. Trucking Employees, Inc., et al.*, Civil Action No. 74–453, United States District Court for the District of Columbia. The decree provides, in part, that the defendant must adopt a goal of hiring at least 33⅓% black and Spanish-surnamed persons in each of several job classifications. This goal appears to have been met with respect to city employ-

ees in Little Rock, but it has not been met with respect to office employees or over-the-road drivers. The consent decree has not been posted for the inspection of employees, and defendant's equal employment opportunity coordinator was not very familiar with its contents.[1] Very little effort was made to communicate either the provisions of the consent decree or general equal-employment principles to defendant's executives, managers, and foremen.

There have been racial incidents at defendant's Little Rock terminal. As Jimmy E. Greene, one of defendant's city employees, put it, there was "an undercurrent" at the terminal. There was an atmosphere, at least partly created by defendant, that caused black employees to believe that they had to work harder than whites to get ahead. Charles Cummings, one of the supervisors, cursed Robert Dibbins, a black employee, and gave him assignments more onerous than those given to whites. This sort of incident occurred several times. The picture, on the other hand, was not unrelieved. Some of the supervisors, including Michael Pettus, were fair to all of the employees, both blacks and whites, as Mr. Greene testified.

Virgil Miller, the plaintiff in this suit, is black. He was first hired by the defendant on September 19, 1975, and he was qualified to do the job—dock man—for which he was hired. He was discharged on October 30, 1975, and after that time defendant continued to receive applications and hire employees to do the same kind of work that Mr. Miller had been doing.

All of these facts, taken together, persuade the Court that the plaintiff has made a prima facie case of discrimination as against the employer defendant.[2] With this

1. There was discussion during the trial about other provisions of the consent decree, provisions apparently affecting the defendant's policies with respect to permitting transfers from the city-employee category to the over-the-road category, and providing compensation for black employees of defendant who may have been discriminated against in the past. Defendant has taken no steps to obey these portions of the decree. Counsel for defendant represented

that the decree has been amended, and that these portions have never gone into effect. This Court expresses no view on whether defendant has complied with the decree in these respects.

2. At the close of the plaintiff's case the complaint was dismissed as to the two union defendants. The Court held, as a matter of law, that no case had been made against either of

background in mind, we now turn to an examination of the specific facts surrounding the plaintiff's discharge. The ultimate question is whether he was discharged, in whole or in part, because he was black. The general evidence that has previously been outlined can do no more than set the stage for this inquiry.

Has the company articulated a legitimate and nondiscriminatory reason for Mr. Miller's discharge? The plaintiff first applied for a job on September 19, 1975. Jimmy Greene, a driver for Jones whose testimony has been referred to earlier in this opinion, suggested that plaintiff apply. He was interviewed by John Chaney, who was at that time Branch Manager. Mr. Chaney was impressed with the plaintiff and gave his application preference over many others already on file with the defendant. Mr. Chaney remarked that the plaintiff had management possibilities (plaintiff has a college degree from Arkansas Polytechnic Institute in Russellville) and that he had a strong chance to get to be a supervisor, perhaps some day even becoming Branch Manager. He directed the plaintiff to report for work at 6:00 o'clock on the morning of Saturday, September 20, 1975, and plaintiff did so. At that time he functioned as a casual employee. That is, he had no regular hours and was entitled to little or no protection under the Collective Bargaining Agreement. He was on call and was expected to report for work whenever called for that purpose. He reported as directed and worked several days as a casual employee. The reports on his work were good. No one complained about him. A foreman, probably Charles Cummings, reported to Mr. Chaney that the plaintiff was working well.

Mr. Chaney then called plaintiff into his office and had him fill out an application for regular employment. After a few days, during which time Mr. Chaney made inquiries about plaintiff, Mr. Miller was made a probationary employee. That is, he began working regular hours, but he was still not a regular employee with full protection under the agreement with the Teamsters, and would not reach that status until satisfactorily completing 30 days as a probationary employee. When he reached probationary status, plaintiff began working on the noon to 8:30 p.m. shift.

After 21 or 22 days in this status, plaintiff was discharged, not yet having reached the position of a regular employee. Mr. Chaney informed plaintiff that he was being released because his foremen had voiced the opinion that he was not "working out." George Cummings, at that time Assistant Branch Manager, had twice told Mr. Chaney that the plaintiff's attitude was not so good as it had been while he worked as a casual employee, that he was standing around without working, and that he was not showing initiative. The first time that Mr. Cummings came to Mr. Chaney with this recommendation, Mr. Chaney was surprised and asked Mr. Cummings to give the plaintiff a little more time. A few days later, however, George Cummings came back and said that plaintiff was doing no better. At that point Mr. Chaney called Mr. Miller in and let him go. He always accepted his foremen's judgment in such matters.

George Cummings testified that his judgment as to plaintiff's work performance was not based, even in part, on race. Certainly the Court is not obliged to accept denials of this sort, especially since the

them. The evidence shows no conduct on the part of the International Union whatever relating to this plaintiff. As far as the Local Union was concerned, its only involvement was to receive a complaint from the plaintiff after his discharge. James French, an officer of the Local Union, declined to attempt to help the plaintiff. Mr. French was probably justified in refusing aid, since under Article 41 of the Collective Bargaining Agreement, which is in evidence as Plaintiff's Exhibit 6, plaintiff, as a

probationary employee, had almost no rights. In any case, there was no proof that Mr. French's refusal to help Mr. Miller had anything to do with race. As a matter of fact, Mr. Miller did not even tell Mr. French that he believed he had been discharged because of his race. Furthermore, neither union defendant was named as a respondent in the charge filed by the plaintiff with the Equal Employment Opportunity Commission.

judgment made by Mr. Cummings was essentially subjective, and plaintiff is apparently the only person ever discharged within the 30–day probationary period. There were no quantitative standards for dock workers at Jones Truck Lines, for example, requirements that a certain number of pounds be loaded or unloaded within a certain period of time. It is possible for such standards to be imposed, but the nature of the business would make devising this type of criterion difficult. In any case, the mere fact that a judgment is subjective does not make it illegal. It is still necessary for the Court, as the trier of fact, to decide what the true motive for the particular personnel action involved really was. In this instance the Court believes Mr. Cummings and finds that his judgment, whether correct or incorrect, was not based, in whole or in part, on the plaintiff's race.

The testimony of Michael Pettus, who was plaintiff's immediate supervisor for about two weeks after he became a probationary employee, is also important. Mr. Pettus (a foreman who, it will be recalled, was described by one of plaintiff's witnesses as fair and decent) testified that Mr. Miller did not show initiative and did not want to "get after it." "He was standing around too long" without working, the witness said. The Court is somewhat troubled by the fact that neither Mr. Pettus nor Mr. George Cummings ever gave Mr. Miller any warning that he was not "working out," but the defendant has a coherent and believable explanation for this omission. Employees who were casual or probationary were left to find their own level, so to speak, and the company simply let them work at their own pace in order to determine for itself what their level of initiative was. Otherwise, an employee whose attention was drawn to his slowness might improve temporarily and then slack off after reaching the protected status of a regular dock worker. The Court accepts this explanation as a reasonable business motive and specifically credits the testimony of Michael Pettus that this motive operated in the case of the plaintiff.

Supervisors at Jones Truck Lines obviously expected a lot from their employees and made quick judgments about the employees' performance. But, as Bobby Maryman, another of plaintiff's witnesses, testified, when George Cummings was on the dock, everybody worked, regardless of whether he was white or black.

The case comes down to this. There was an atmosphere of discrimination at Jones Truck Lines, and the company's efforts at equal employment opportunity, considered as a whole, fell far short. In the individual case of Virgil Miller, however, which is of course the case to be decided by the Court, the company did have a legitimate and non-discriminatory reason for its action, and this reason was not merely pretextual. The burden of persuasion remains on the plaintiff throughout the case, and the Court holds that it has not been met. See *Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam).

It follows that the complaint will be dismissed with prejudice.