MISSOURI COMMISSION ON HUMAN RIGHTS, Appellant,

v.

CITY OF SIKESTON/SIKESTON POWER PLANT/BOARD OF MUNICIPAL UTILITIES, Respondent.

No. 15790.

Missouri Court of Appeals, Southern District, Division Two.

April 21, 1989.

W.H. Winchester, III, Sikeston, for appellant.

Nina Hazelton, Jefferson City, for respondent.

FLANIGAN, Presiding Judge.

On February 2, 1982, Willie J. Sykes, who is black, filed a complaint with the Missouri Commission on Human Rights, (the Commission), alleging that the City of Sikeston, by whom he was employed until that date, was guilty of an unlawful employment practice. In essence his complaint was that the City, through its agents, racially discriminated against him with respect to terms and conditions of his employment at the City's power plant.

Section 296.020 RSMo 1978,[1] on which the complaint was based, read, in pertinent part:

"1. It shall be an unlawful employment practice: (1) For an employer ... (a) ... to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's race ..."

His complaint also alleged that his working conditions became so intolerable that on February 2, 1982, the City had "constructively discharged" him and he was forced to resign.

Two evidentiary hearings were held before a hearing examiner, who made extensive findings of fact and conclusions of law. The Commission adopted those findings and conclusions. The Commission found that the City violated § 296.020.1(1) by discriminating against Sykes "by imposing disparate terms and conditions of employment" upon him because of his race. The Commission also found that Sykes voluntarily resigned on February 2, 1982, "and was not constructively discharged."

The City timely filed a petition for review in the Circuit Court of Scott County. On May 9, 1988, the circuit court entered its judgment reversing the order of the Commission. The Commission appeals.

The Commission's sole point is that the circuit court erred in reversing the Commission's "decision and order that [the City] violated § 296.020[.1](1)(a), RSMo 1978, by imposing disparate terms and conditions of employment on [Sykes] in that there is substantial and competent evidence that Mr. Sykes, a black person, was given work assignments less favorable than those given to white employees in his classification and that the reasons articulated by [the City] for its action are pretext." For the reasons which follow, this court holds that the point is meritorious.

On this appeal this court reviews the findings and decision of the Commission, not the judgment of the circuit court. *Hulshof v. Mo. Highway & Transp. Com'n,* 737 S.W.2d 726, 727 (Mo. banc 1987). This court must decide "whether the Commission, after detached consideration of all the evidence before it, could reasonably have made the findings and order, and whether the decision is arbitrary, capricious, unreasonable or an abuse of discretion." *Midstate Oil v. Mo. Com'n on H. Rights,* 679 S.W.2d 842, 846[3] (Mo. banc 1984).

Sykes did not intervene in the instant proceeding. The evidence concerning discrimination was presented by the attorney general. References in this opinion to the burdens on the employee refer, under the situation here, to the State, the party seeking to establish discrimination. See *Com'n on Human Rights v. St. Louis Cty. Bd.,* 714 S.W.2d 873, 875, n. 2 (Mo.App.1986).

"The pivotal issue in any claim of unlawful discrimination is whether the employer's conduct challenged by the plaintiff was motivated by an invidious purpose or whether it was based on a legitimate and rational consideration." *Midstate Oil,* supra, at 845[1]. Section 296.020.1 prohibits purposeful discrimination on the basis of one's race, but it does not forbid an employer from making an employment decision that adversely affects a person within a protected class so long as the decision "was motivated by rational and non-discriminatory considerations reasonably related to the employer's business operation." *Id.* at 847.

In reviewing discrimination claims filed pursuant to Chapter 296, Missouri courts have lent some deference to federal cases construing similar claims under the Civil Rights Act of 1964. See *R.T. French Co. v. Springfield Mayor's Com'n,* 650 S.W.2d 717, 721 (Mo.App.1983); *St. Louis Co. Bd.*

1. In 1986 Chapter 296, Discriminatory Employment Practices, was repealed, and Chapter 213 V.A.M.S. was amended and expanded to include the subject matter of the repealed provisions. In the case at bar the proceedings before the Commission were completed and the City's petition for review was filed in the circuit court before Chapter 296 was repealed. Section 296.050.2 and § 296.050.3 dealt with procedure for judicial review of a final order of the Commission. The identical procedure is now found in § 213.085.2 and § 213.085.3.

*v. Mo. Com'n on Human Rights,* 668 S.W. 2d 592 (Mo.App.1984). See also *K.C. v. Mo. Com'n on Human Rights,* 632 S.W.2d 488, 490[3–5] (Mo. banc 1982). Section 703(a)(1) of that Act, now 42 U.S.C.A. § 2000e–2(a)(1), contains the same language found in § 296.020.1 set forth in the second paragraph of this opinion.

In *Midstate Oil* the court held that disparate treatment claims under § 296.020 should be tried and evaluated under the methodology set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

"In [*McDonnell Douglas Corp. v. Green*] ... we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, non-discriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Where, as here, an employee claims that, on account of his race, he has been the victim of disparate treatment by his employer, the employee has the burden of proving that the employer was motivated by discriminatory intent. *Watson v. Fort Worth Bank and Trust,* 487 U.S. ——, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). The employee may carry this burden by direct or circumstantial evidence. *U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). The ultimate issue is whether the employer's decision was made on the basis of race, *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 2798, 81 L.Ed.2d 718 (1984), that is, whether the employee was treated less favorably because of his race. *Aikens,* supra, 103 S.Ct. at 1482. The burden of proof "remains at all times" on the employee. *Cooper v. Federal Reserve Bank of Richmond,* supra, 104 S.Ct. at 2799; *Aikens,* supra, 103 S.Ct. at 1482.

■ The prima facie case method established in *McDonnell Douglas* was never intended to be "rigid, mechanized, or ritualistic." *Aikens,* supra, at 1482. If the employee makes a prima facie case, there arises a rebuttable presumption that the employer unlawfully discriminated against him, *Aikens,* supra, at 1481, and if the employer "is silent in the face of the presumption," no issue of fact remains in the case and the employee is entitled to the judgment. *Burdine,* supra, 101 S.Ct. at 1094.

■ If the employee makes a prima facie case, the employer must "clearly set forth, through the introduction of admissible evidence," the reason for the employment decision. *Aikens,* supra, 103 S.Ct. at 1481. The reason must be "a legitimate, nondiscriminatory reason," *Burdine,* supra, 101 S.Ct. at 1094, but the employer need not persuade the trier of fact that he was actually motivated by the proffered reason. It is sufficient that the employer's evidence raises a genuine issue of fact as to whether he discriminated against the employee. Id. The employee must have the opportunity to show that the proffered reason was not the true reason for the employment decision, but rather a pretext. *Aikens,* supra, 103 S.Ct. at 1482, n. 5.

■ If the employer "has done everything that would be required of him" if the employee had properly made out a prima facie case, whether the employee really did so is no longer relevant. *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 107 S.Ct. 367, 371, 93 L.Ed.2d 305 (1986). When the employer produces evidence that the em-

ployment decision was made for a legitimate, nondiscriminatory reason, the presumption of discrimination "drops from the case" and the trier of fact is in a position to decide the ultimate question: whether the particular employment decision at issue was made on the basis of race. *Cooper v. Federal Reserve Bank of Richmond,* supra, 104 S.Ct. at 2799.

■ The employee may carry his burden of persuasion either directly by persuading the trier of fact that a discriminatory reason likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Aikens,* supra, 103 S.Ct. at 1482. The trier of fact must then decide which party's explanation it believes. Id.

■ The statute does not require an employer to give preferential treatment to minorities. *Burdine,* supra, 101 S.Ct. at 1096. When all legitimate reasons for rejecting an employee have been eliminated as possible reasons for the employer's actions, it is more likely than not that the employer based his decision on an impermissible consideration such as race. *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

■ In 1981 the City operated two power plants which generated electricity for the City and surrounding areas. One of those plants, at which Sykes was hired on November 23, 1981, was a new plant which had been in operation only a short time. In November the plant also hired several white employees, including Evans, Mikels, Knuckles, Neel, and Owens. Those men and Sykes were placed initially in the Maintenance Operations Pool (MOP). The MOP crew provided general plant labor and the members were assigned duties on an "as needed" basis.

The record shows the respective backgrounds of Sykes and the five white men. In general, it may be said that Sykes' background as a skilled laborer was at least equal to the background of the five white employees, and probably was superior to the background of most of them. From 1975 until he was laid off in 1980, Sykes worked at the Union Carbide nuclear power plant in Paducah, Kentucky, where he was a "maintenance mechanic, first class." During his employment with Union Carbide he successfully completed a two-year apprenticeship program in maintenance mechanics and also completed a welding program. Union Carbide certified Sykes as a welder. Because of his background, Sykes was placed by the City in the highest of four grades of starting salaries. The five white employees were placed in the lowest grade.

The plant superintendent was Maurice Hixon. Under Hixon was maintenance superintendent Ray Moll. Under Moll were supervisor Merrill Ford, who was in charge of "mechanical maintenance," and supervisor Jack Martin, who was in charge of the plant/grounds maintenance department. Moll testified that new employees who were placed in MOP received "on the job" training, which enabled them to prepare for higher positions such as mechanic, operator, or electrician. Rotation of the individual members of the MOP crew was desirable in order to give them an equal chance to learn about higher positions by associating with journeyman mechanics, operators, and electricians.

The plant/grounds maintenance department was responsible for janitorial work inside the plant, and also for maintenance of the grounds, including mowing and landscaping. Martin was responsible for assigning the MOP employees to their respective duties in the various departments.

A MOP employee assigned to the mechanical maintenance department normally assisted a journeyman mechanic. The duties of the MOP employee included carrying tools and doing minor disassembly work, as well as cleaning the area after a job was complete. Maintenance superintendent Ray Moll testified that if an employee desired to bid for a mechanic's job, it would "absolutely" be helpful to him if,

as a member of MOP, he had worked in the mechanical maintenance department.

Sturgeon, a white man hired in November 1981, was placed in the mechanical maintenance department immediately. Evans, Mikels, and Knuckles worked for a short time in the plant/grounds maintenance department, but were soon assigned to the mechanical maintenance department where they continued to work until each bid into a higher position. Neel and Sykes were assigned to the plant/grounds maintenance department until February 2, 1982, when Martin assigned Neel to the mechanical maintenance department. Also on February 2, 1982, Sykes resigned.

Merrill Ford testified that Sykes worked in the mechanical maintenance department on occasion. Ford's testimony on this point was contradicted by Sykes and by the City's records. The Commission found that Ford's testimony was not credible on that point.

During his employment by the City, Sykes was always assigned to plant/grounds maintenance work and he usually worked with another city employee, Robert Parr, who is black. Sykes spent the majority of his time outdoors "cleaning fly ash from the fly ash pond," carrying debris to the dump, and doing other forms of menial labor. One of Sykes' jobs was to help float pontoons in order to extend the fly ash line. Mechanics were used on that project to connect the pipe and then Sykes, Parr, and two other employees placed the pipe onto pontoons. The mechanics completed their duties before Sykes and the other employees commenced theirs, so Sykes did not directly work with or assist the mechanics.

Sykes' duties inside the plant included sweeping, buffing, and waxing floors and cleaning coal from the tripper room floor. Sykes wanted to work in the mechanical maintenance department so he could utilize his mechanical experience and training. According to a collective bargaining agreement then in force, MOP employees could "bid" for a higher position only after completing a six-month probationary period. Two white employees, Albritton and Owens, who were also hired in November 1981, were promoted to assistant auxiliary workers in January 1982. Although it was plant policy to inform all new employees of the bidding process at the time they were hired, Sykes testified that no such information was given him until he had worked at the plant a month or so.

On February 2, 1982, according to Sykes, he quit his job after superintendent Martin informed him that Sykes would be taking over the duties of a discharged employee. Those duties consisted of cleaning bathrooms and offices, buffing floors, and taking out trash. The Commission found that Sykes quit because he was asked to take over those duties. The Commission also found, however, that Sykes was aware of the bidding process and knew that he would be eligible for a promotion to mechanical helper when such a position became open for bid. The Commission found that Sykes did not ask Martin whether the new janitorial assignment was to be permanent, nor did Sykes go to the plant superintendent, the maintenance superintendent, or the union steward to determine if he had options other than resignation.

The Commission found that Sykes, as a black man, was a member of a class protected by § 296.020. The Commission made these additional findings: Sykes was always assigned to janitorial type duties within the plant/grounds maintenance department, while white employees Sturgeon, Evans, Mikels, and Knuckles were given assignments with the mechanical maintenance department. The latter assignments allowed the white employees "to gain familiarity with [the City's] procedures, which was helpful to them in bidding for promotion."

The Commission found that the City advanced five reasons for the job assignments given Sykes:

First: Sykes had been assigned to the mechanical maintenance department on occasion. The Commission found that there was no factual basis for that reason.

Second: Co-worker Parr, a black man, had requested that Sykes be assigned to work with him. The Commission found that Parr had no authority to request particular job assignments for MOP employees, that the City had no obligation to honor Parr's request, that Parr was not in a managerial or decision-making position, and that Parr had no authority to speak for the City. Because of those facts, the Commission found that the second reason was not a legitimate, non-discriminatory one.

Third: The work Sykes did on the fly ash pond was technically mechanical maintenance work. The Commission found that this reason was pretextual, that at no time while performing this work did Sykes actually assist any mechanics, and further that this work occurred only every two weeks and accounted for very little of the work done by Sykes.

Fourth: All MOP employees were requested to perform clean-up work regardless of the department to which they were assigned. The Commission found this reason was pretextual because the work done by the white MOP employees assigned to the mechanical maintenance department was qualitatively different from the janitorial work done by Sykes. The clean-up work done by the white employees was incidental to mechanical maintenance operations or was done when no maintenance jobs were available. The clean-up work done by Sykes was "the primary component of the job." The white employees assigned to mechanical maintenance were afforded an opportunity to observe and learn from mechanics, but no such opportunity was ever open to Sykes.

Fifth: Some MOP crew members were assigned more frequently to the mechanical maintenance department than others because they were assigned on an "as needed" basis. The Commission found this reason was pretextual. Although superintendent Moll testified that new employees were to be rotated so as to give them all an equal chance to learn by working with journeymen, Sykes was never so rotated. On the other hand, Sturgeon worked at all times in the mechanical maintenance department, Albritton and Owens were promoted, Evans, Mikels, and Knuckles were assigned to the mechanical maintenance department, and so was Neel. The prior experience of some of the white workers was substantially less than the prior experience of Sykes, as shown by the fact that Sykes' initial employment was at the highest pay grade. Moreover, Sturgeon, Knuckles, Evans and Mikels were not merely assigned to the mechanical maintenance department on an "as needed" basis, but remained there until they bid into higher positions.

The Commission also found that Sykes was not only treated differently from white MOP employees in the nature of his daily job assignments, but his opportunities for "on the job" training, which in turn affected promotional opportunities, were limited by his continuously being assigned to the plant/grounds maintenance department. The Commission found that the City violated § 296.020.1(1)(a) "by imposing disparate terms and conditions of employment" upon Sykes.

The Commission found, however, that Sykes was not constructively discharged because he had alternatives to resignation, was aware of the City's bidding process, and would be eligible to "bid out of" MOP in the future. The Commission found that Sykes failed to determine whether the janitorial assignment Martin had given him on February 2, 1982, was permanent or temporary, that Sykes did not go to his superiors to complain or seek redress, and that he voluntarily resigned.

Referring to "City of Sikeston/Sikeston Power Plant/Board of Public Utilities" as "respondent," the order of the Commission, filed February 5, 1986, included the following:

"IT IS HEREBY ORDERED:

1. That Respondent shall cease and desist from using race as a factor in making work assignments for Maintenance Operations Pool employees.

2. ...

3. That, within six (6) months of the effective date of this order, Respondent shall develop and adopt a nondiscriminatory system for making work assignments within the Maintenance Operations Pool.

4. That, within thirty days of the effective date of this order, Respondent shall display a copy of the Commission's poster 'Missouri's Discriminatory Employment Practices Law and Poster' in a conspicuous location in its place of business." [2]

■ This court holds that there was competent and substantial evidence upon the whole record to support the finding of the Commission that the City violated § 296.020.1(1) by discriminating against Sykes by imposing disparate terms and conditions of employment upon him because of his race. This court also holds that the action of the Commission was not in excess of its jurisdiction or statutory authority, and that said action was not arbitrary, capricious, or unreasonable and did not involve an abuse of discretion.

■ The brief of the City presents this argument: "No prima facie case was made establishing that Sykes was discriminated against in any way because Sykes voluntarily quit his job with knowledge of the consequences and under conditions which did not rise to a 'constructive discharge' by the City." In effect, the City argues that the Commission's finding that Sykes was the victim of racial discrimination is inconsistent with its finding that he was not constructively discharged. There is no merit in this argument.

2. Paragraph 2 of the order required the City to reinstate Sykes "as a probationary employee in the Maintenance Operations Pool at the same level of seniority he had acquired on February 2, 1982." The Commission's reply brief in this court states: "Reinstatement was not an available remedy in this case and should not have been ordered."

Paragraphs 5 and 6 of the order dismissed that portion of the complaint which alleged that the City had constructively discharged Sykes. The Commission's brief, as appellant in this court, states: "The Commission found that

The U.S. Court of Appeals for the Eighth Circuit has said: "A constructive discharge exists when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job.... To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit." *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981). The Tenth Circuit is in general agreement. *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir.1982). In *Irving* the court pointed out that a constructive discharge is actionable under the Federal Act only if it is motivated by factors such as race, sex, or national origin. That court also stated that a finding of constructive discharge depends upon whether a reasonable man would view the working conditions as intolerable, not upon the subjective view of the employee-claimant.

The Fifth Circuit has held, however, that an employee claiming to have been constructively discharged need not prove that "it was the employer's purpose to force the employee to resign." *Pittman v. Hattiesburg Mun. Sep. Sch. Dist.*, 644 F.2d 1071, 1077 (5th Cir.1981); *Borque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980).

■ Under either view, it is clear that evidence supporting a finding of discrimination does not compel, and may fall short of supporting, a finding of constructive discharge. Thus a discriminatory failure to promote is not per se sufficient to constitute a constructive discharge. *Grigsby v. N. Miss. Medical Center, Inc.*, 586 F.2d 457

[Sykes] had not been constructively discharged and appellant does not dispute this ruling."

The brief of the City as respondent in this court at least tacitly, and understandably, agrees that Sykes was not constructively discharged and was not entitled to reinstatement. Accordingly, that portion of the trial court's judgment which reversed paragraph 2 of the Commission's order is affirmed. Paragraphs 1, 3, 4, 5 and 6 of the Commission's order are proper, and that portion of the trial court's judgment which reversed those paragraphs is itself reversed.

(5th Cir.1978). An unlawful transfer does not per se constitute a constructive discharge. *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114 (1st Cir.1977). Unequal pay, based on discrimination, is not per se a constructive discharge. *Heagney v. University of Washington,* 642 F.2d 1157 (9th Cir.1981); *Borque v. Powell Electrical Mfg. Co.,* supra. Quoting from *Clark v. Marsh,* 665 F.2d 1168, 1173 (D.C. Cir 1981), the court, in *Irving,* supra, said, at 172, that case law indicates "a general reluctance to predicate a finding of constructive discharge upon the *fact* of discrimination." See also: Annot. 55 A.L.R.Fed. 418, 425, § 6(b).

That portion of the trial court's judgment which reversed paragraph 2 of the Commission's order is affirmed; that portion of the trial court's judgment which reversed paragraphs 1, 3, 4, 5, and 6 of the Commission's order is reversed and the cause is remanded with directions to the trial court to enter its order implementing paragraphs 1, 3, and 4 of the Commission's order with the time periods for compliance contained respectively in paragraphs 3 and 4 to run from the date the mandate of this court is received in the trial court.

It is so ordered.

MAUS and PREWITT, JJ., concur.